UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALHAJI B. IBRAHIM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 09 C 5252 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| CHICAGO TRANSIT AUTHORITY, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

After an on-the-job injury left him visually impaired and unable to work as a bus operator, Alhaji B. Ibrahim filed suit against his employer, the Chicago Transit Authority (the "CTA"). That case settled in 2004, with the CTA agreeing to place Ibrahim in a janitor position at one of its garages. But the parties have returned to federal court for a second round of litigation. Ibrahim now contends that the CTA breached the parties' settlement agreement and that the CTA failed to accommodate him by requiring him to participate in a job pick approximately six months after he began working as a janitor pursuant to the parties' 2004 settlement agreement. Because of his lack of seniority as a janitor, Ibrahim was placed in a position that had the potential of reporting to different locations throughout the week. Both parties have filed motions for summary judgment [122, 130]. Because Ibrahim did not timely exhaust his failure to accommodate claim, which as pleaded in the Second Amended Complaint focuses on the CTA's refusal to exempt him from the January 2006 job pick, summary judgment is granted for the CTA on that claim. But because there is a genuine issue of fact as to whether the settlement agreement requires Ibrahim to be placed in a janitor position not subject to changing locations, and the Court does not find this issue to be one that falls within the Illinois

Labor Relation Board's ("ILRB") exclusive jurisdiction, the breach of contract claim must proceed to trial. Finally, because the CTA is immune from punitive damages and Ibrahim is not entitled to recover them on his breach of contract claim, his request for punitive damages is stricken from the Second Amended Complaint.

## BACKGROUND[1]

Ibrahim initially began working for the CTA in 1992 as a temporary bus operator, becoming a full-time permanent bus operator in 1994. In June 1997, after being sprayed with mace by a passenger on the bus he was operating, Ibrahim developed vision problems. Unable to operate a bus, he was placed in the CTA's administrative holding area (known as "Area 605") in August 1997. Eligible union employees are placed in Area 605 while on approved medical leave and may remain there while recovering from their medical conditions for a period of up to two years. At the end of the two year period, the employee must take one of the following actions: (1) request a one-year extension, (2) return to active work status, (3) apply for an occupational injury disability pension, (4) apply for a non-occupational disability pension, or (5) retire. Otherwise, the employee is administratively separated from the CTA. Ibrahim remained in Area 605 for the two year period and then, because he did not take one of the five actions listed above, was administratively separated from the CTA in 1999.

In 2000, Ibrahim filed suit in federal court against the CTA, alleging that the CTA discriminated against him based on his disability and failed to accommodate his disabilities. The court appointed counsel to represent him and, with the assistance of the Lighthouse for the Blind,

---

[1] The facts in this section are derived from the parties' Joint Statement of Undisputed Material Facts, Doc. 124, and supporting exhibits.

the parties negotiated a settlement, placing Ibrahim in a janitor position with the CTA.[2] The parties' settlement agreement, entered into on March 11, 2004, provides:

> Upon the execution of this Agreement, and notwithstanding any agreement, contract, document or policy of the CTA to the contrary, including, without limitation, any such agreement, contract, document or policy established in connection with recent contract negotiations and the resulting contract between CTA and the Amalgamated Transit Union, Local 241 (hereinafter, the "Union"), CTA agrees to reinstate Ibrahim into (i) that certain full time permanent Buildings and Grounds Janitor position at the bus garage located at the intersection of Kedzie and Madison immediately available and currently held/reserved for Ibrahim or (ii) a full time permanent Buildings and Grounds Janitor position at any other comparable bus garage located within the city limits of Chicago, Illinois immediately available to Ibrahim (either of such positions, hereinafter, the "Job Position"). The Job Position shall be at the rate of pay of a Buildings and Grounds Janitor, at the same progression level held by Ibrahim on the date he last worked and with no loss of seniority with respect to the benefits of employment with CTA, including but not limited to vacation benefits and not including "picking" rights which are a benefit determined by union seniority, addressed in Paragraph 7, below.

Ex. H to Joint Stmt. of Undisputed Facts, ¶ 1. Paragraph 7 provides:

> The Union shall determine Ibrahim's union seniority. Ibrahim agrees to make no claim against the CTA, its agents, employees or Directors regarding the Union's seniority decision, except for claims relating to or arising out of rights granted specifically herein.

*Id.* ¶ 7. Additionally, the CTA agreed to purchase certain equipment for Ibrahim, including an Optelec 317 video magnifier, which was to be "used by Ibrahim on the job." *Id.* ¶ 4. The settlement agreement also provided that Ibrahim was to have the assistance of an Orientation and Mobility Instructor and a Job Coach, to be paid for by the Lighthouse for the Blind.

---

[2] These janitor positions were usually filled by CTA employees who had entered into settlement agreements with the CTA because they were unable to fulfill their previous job duties for medical or other reasons.

By the time Ibrahim was cleared to return to work in June 2005, the contemplated position as a janitor at the Kedzie garage was no longer available and all other janitor positions were filled. William Mooney, the Vice President of Bus Operations at the time who oversaw the CTA's eight bus garages and its janitors, created an additional janitor position at the Chicago Avenue garage for Ibrahim. Dan Helpingstine, who worked at the Lighthouse for the Blind as the Manager for Job Readiness and Placement, visited the Chicago Avenue garage before Ibrahim was assigned there and determined that Ibrahim could work at that location. Although most CTA garages only employed one janitor, because the Chicago Avenue location housed both a garage and a training center, with Ibrahim's addition, there were three janitors on site.

On June 13, 2005, Ibrahim began training for his position as a janitor at the Chicago Avenue garage. The training was designed to "insure that Mr. Ibrahim could conduct the job tasks of Building and Grounds Janitor to the best of his abilities without jeopardizing his safety and welfare as well as the safety and welfare of others." Ex. O to Joint Stmt. of Undisputed Facts at 1. Dennis Cristofaro, who trained Ibrahim, wrote that Ibrahim "performed as well as could be expected." *Id.* Cristofaro also noted that "[f]amiliarization with the environment that [Ibrahim] will be working in and developing and implementing a structured job routine are going to be the ultimate factors in deciding the ability of Mr. Ibrahim to perform his duties." *Id.* During the training, Ibrahim was instructed on how to use the Optelec magnifier, for which Cristofaro noted "the Chicago Garage will have to provide a securer and accessible location to place the magnifier for Mr. Ibrahim to use."[3] *Id.* at 2. After the training was complete, Ibrahim reported for work at the Chicago Avenue garage on June 27, 2005.

Pursuant to the CTA's collective bargaining agreement ("CBA") with the Amalgamated Transit Union, Local 241 (the "Union"), janitors are allowed to pick their job locations two times

---

[3] The Optelec magnifier is a stationary piece of equipment that weighs approximately 51 pounds.

per year. Ibrahim began work after a pick had occurred, but in December 2005, the CTA informed him that he would have to participate in the next pick for janitor positions scheduled for January 9, 2006. Ibrahim told Kirsten Payne-Brown, the CTA employee in charge of the picking process for janitors, that his agreement with the CTA exempted him from the pick and asked to remain at the Chicago Avenue garage. Payne-Brown obtained the settlement agreement, reviewed it, and consulted with her supervisor and the Union. But she concluded that the agreement did not contain any special provisions exempting Ibrahim from the pick. One of Ibrahim's co-workers also did not think Ibrahim should participate in the pick and approached Keith Hill, a Union representative at the Chicago Avenue garage, about the issue. Hill then spoke with Robert Bravi, the Chicago Avenue garage general manager, about the issue and asked to see Ibrahim's settlement agreement. Bravi did not show Hill the settlement agreement but informed Hill that Ibrahim had to participate in the pick. The CTA could have approached the Union to request that Ibrahim not be required to participate in the pick, but it did not.

At the January 9, 2006 pick, there were nineteen janitors selecting for nineteen positions. The position Ibrahim had occupied for the previous six months at the Chicago Avenue garage was eliminated for budgetary reasons. Because Ibrahim had the least seniority among the janitors, he was to pick last. But Ibrahim did not attend the pick to choose a new assignment. At the time he was supposed to pick, however, the only available position was an extra board position based out of the Forest Glen garage. An extra board janitor fills in for regular employees off work for any reason. As a result, an extra board janitor would typically receive his or her schedule the Friday before the work shift started on Sunday and could be assigned to two or three different locations in any given week. All garages at which the extra board janitor

5

could potentially be asked to work had similar layouts and could be reached by public transportation.

Although Ibrahim did not attend the pick, the CTA expected him to begin work as an extra board janitor out of the Forest Glen garage the following week. Although he was supposed to begin work on a Sunday, the start date was moved to Monday so that Helpingstine, from the Lighthouse for the Blind, could be there to help orient Ibrahim to his new location. Ibrahim never went to work at the Forest Glen garage, however. Instead, on January 13, 2006, the Friday before he was to start there, Ibrahim went out sick with high blood pressure and high eye pressure. His sickness was connected to anxiety related to the upcoming job location change.

Ibrahim remained in Area 605, although he periodically met with the CTA's medical staff in an attempt to return to work. On December 28, 2007, Dr. Realiza, the CTA's medical officer, examined Ibrahim to determine whether he was able to return to work. Dr. Realiza instructed Ibrahim that he needed to see his doctors and obtain notes from them regarding whether he was able to return to work. Dr. Realiza was particularly concerned about his blood sugar levels. On January 10, 2008, Ibrahim obtained a note from his primary care physician, Dr. Allison Martin, indicating that he was "medically stable to return to work." Ex. S to Joint Stmt. of Undisputed Facts. He also obtained a note from his ophthalmologists dated January 31, 2008 stating that his vision was stable. Both these notes were found in the CTA's files, but Dr. Realiza did not recall having seen Dr. Martin's note. In fact, Dr. Realiza's notes from her February 7, 2008 examination with Ibrahim mention the ophthalmologist note but not that from Dr. Martin. Dr. Realiza testified that if she received a note from Ibrahim's doctor that Ibrahim's blood sugar levels were acceptable and that Ibrahim was able to return to work, she would find him able to return to work.

During her February 7, 2008 examination, Dr. Realiza again found Ibrahim's blood sugar levels were too high, rendering him unfit to work. Ibrahim never returned to see Dr. Realiza. He was then administratively separated from the CTA on May 1, 2008, upon the CTA's determination that he had used all of his time in Area 605 and had not provided sufficient documentation to allow him to stay in Area 605 for an additional year or to return to work.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The same standard applies when considering cross-motions for summary judgment. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Therefore, when considering Ibrahim's motion for partial summary judgment, the Court views

7

all evidence in the light most favorable to the CTA, and when considering the CTA's motion, the Court views all evidence in the light most favorable to Ibrahim. *Id.*

## ANALYSIS

I. **Failure to Accommodate Claim (Count II)**

In Ibrahim's Second Amended Complaint, he alleges that the CTA failed to accommodate his request to continue working at the Chicago Avenue garage in fall 2005 and instead required him to participate in the January 9, 2006 job pick and change job locations. According to the Second Amended Complaint, the CTA's failure to accommodate his request to remain at the Chicago Avenue garage rendered Ibrahim unable to work from January 13, 2006 to the present. In moving for summary judgment on this claim, the CTA contends that Ibrahim's claim is outside the scope of his EEOC charge and thus untimely.

Under the Americans with Disabilities Act ("ADA"), Ibrahim was required to file a charge of discrimination within 300 days of the occurrence of the unlawful employment practice. 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5; *Stepney v. Naperville School Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004). Failure to accommodate is considered a discrete act, not a continuing violation. *Teague v. Northwestern Mem'l Hosp.*, 492 F. App'x 680, 684 (7th Cir. 2012). "If a plaintiff does not file a charge concerning a discrete act within the 300-day window, her claim is time-barred and she may not recover." *Bass v. Joliet Public Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014). Ibrahim claims that the CTA failed to accommodate his request to remain at the Chicago Avenue garage in fall 2005, an act effectuated in January 2006 when he was transferred to the Forest Glen garage as an extra board janitor. To recover for this failure to accommodate, he had to file an EEOC charge by mid-November 2006. But Ibrahim filed his charge on September 2, 2008, well past the 300-day statutory period. Thus, his failure to accommodate

8

claim is barred because it is untimely. *Teague*, 492 F. App'x at 684; *U.S. E.E.O.C. v. Graphic Packaging Int'l, Inc.*, No. 12 C 6371, 2013 WL 3321606, at *2–4 (N.D. Ill. July 1, 2013) (refusals to accommodate occurred over 300 days before plaintiff filed EEOC charge, making claims based on those refusals untimely).

In response to the CTA's summary judgment motion, however, Ibrahim argues that he may recover for the CTA's failure to accommodate his later requests to be reinstated from Area 605 to a non-extra board janitor position. In connection with the summary judgment briefing, Ibrahim submitted an affidavit stating that, "in [his] attempts to return to work after January of 2006, whenever [he] contacted the CTA's medical department asking them to clear [him] to return to work, [he] believed [he] was asking the CTA to give [him] a position as a janitor that [he] could perform despite [his] disability." Ex. T to Joint Stmt. of Undisputed Material Facts, ¶ 6. Ibrahim contends that any requests he made from November 7, 2007 through his termination date of May 1, 2008 are timely and should be considered by the Court. Because he stated in his EEOC charge that he was denied a reasonable accommodation in December 2007. The problem with this theory, however, is that Ibrahim is raising it for the first time in response to the CTA's motion for summary judgment. *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). His Second Amended Complaint includes no mention of any such requests for accommodation, focusing instead only on the 2006 job pick. The Court cannot allow Ibrahim to now proceed on this new theory, raised for the first time almost five years after the case was filed and well after all discovery has been completed. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (in response to summary judgment motion, plaintiff could not reassert claims that were raised in initial complaint but then

9

abandoned in amended complaint because defendant was "relying on [plaintiff's] second amended complaint [and so] had not received the fair notice required by the federal pleading rules"). Thus, the Court need not further address Ibrahim's failure to accommodate claim, as the one asserted in his Second Amended Complaint is untimely and his attempt at asserting a timely claim is waived. Summary judgment is granted for the CTA on Ibrahim's ADA failure to accommodate claim.

## II. Breach of Contract Claim (Count I)

### A. Jurisdiction

The CTA argues that the Court should dismiss the breach of contract claim without prejudice because the federal claim that gave this Court jurisdiction has been dismissed. *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). But the Court does not automatically lose jurisdiction over a supplemental state law claim once it grants summary judgment on the federal claim; rather, it has the discretion to retain jurisdiction over the state law claim. *See Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007); *Groce*, 193 F.3d at 500 & n.6. The Court should consider, at every stage of the litigation, whether supplemental jurisdiction serves "the values of judicial economy, convenience, fairness, and comity," *City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 173, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997), and should retain jurisdiction where substantial judicial resources have been expended on resolution of the supplemental claim so that relinquishing jurisdiction would cause substantial duplication of effort, *Williams Elecs. Games*, 479 F.3d at 906–07 (collecting cases). This case has been pending since 2009, and counsel has been appointed to represent Ibrahim.

Appointed counsel has invested substantial time and resources to press Ibrahim's state and federal claims on a *pro bono* basis. Although the breach of contract claim is a state law claim, it arises out of a breach of a settlement agreement resolving Ibrahim's prior federal case. Discovery has concluded, and the parties have fully briefed the merits of whether Ibrahim's breach of contract claim should proceed past summary judgment. It is more efficient to resolve the issue here, as the Court has familiarity with the underlying issues of the case and the prior proceedings, than to require Ibrahim to start over in state court. Thus, the Court will exercise its discretion to retain jurisdiction over Ibrahim's breach of contract claim. *See Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008) (judicial economy served by exercising jurisdiction over state claims where, among other factors, litigation had been ongoing for several years and discovery was complete); *Whitted v. Joshua*, No. 01 C 5489, 2009 WL 2163459, at *3 (N.D. Ill. July 20, 2009) (retaining jurisdiction where discovery had been extensive, case had been pending for extended period of time, and "substantial judicial resources have already been expended by both this Court and the parties in addressing the present arguments in the summary judgment briefs and exhibits").

Aside from this argument, the CTA also argues that the Court does not have subject matter jurisdiction over Ibrahim's breach of contract claim because it involves interpretation of the CBA. The Illinois Public Labor Relations Act ("IPLRA") was enacted "to regulate labor relations between public employers and employees, including the designation of employee representatives, negotiation of wages, hours and other conditions of employment, and resolution of disputes arising under collective bargaining agreements." 5 Ill. Comp. Stat. 315/2. The CTA contends that determining whether the settlement agreement was breached will infringe on the ILRB's exclusive jurisdiction over interpretation of collective bargaining agreements, including

the agreement between the CTA and the Union. *See McGreal v. Vill. of Orland Park*, No. 12 C 5135, 2013 WL 3984477, at *11 (N.D. Ill. Aug. 2, 2013) (collecting cases).

The CTA argues that Ibrahim's challenge is not to whether the CTA complied with the provisions of the settlement agreement but rather generally to the seniority and picking provisions of the CBA. Ibrahim, on the other hand, argues that he is not challenging the CBA but rather whether the CTA has complied with the plain terms of the settlement agreement. He contends that the settlement agreement does not subject him to the CBA's picking provisions for job placement and that determining this question does not require an interpretation of the CBA.

The Court agrees with Ibrahim that his breach of contract claim does not invoke the exclusive jurisdiction of the CBA but rather involves analysis of the settlement agreement between the parties—an agreement that Ibrahim contends created rights independent of the CBA. Indeed, the first paragraph of the settlement agreement states that the CTA's obligation is "notwithstanding any agreement, contract, document or policy of the CTA to the contrary, including . . . any such agreement, contract, document or policy established in connection with recent contract negotiations and the resulting contract between CTA and the [Union]." Ex. H to Joint Stmt. of Undisputed Facts, ¶ 1. This means that the CTA's agreement to place Ibrahim in the janitor position was made without regard to the CBA—potentially even contrary to it.[4] Moreover, Ibrahim's claim is not one founded on the CTA's failure to comply with the CBA, which is the typical labor-related claim that falls within the ILRB's exclusive jurisdiction. *See, e.g.*, *McGreal*, 2013 WL 3984477, at *11 (claim based on defendants' alleged failure to comply with the CBA); *Cessna v. City of Danville*, 693 N.E.2d 1264, 1265–66, 296 Ill. App. 3d 156, 230 Ill. Dec. 513 (1998) (breach of contract claim against city for violation of CBA). Instead,

---

[4] Although the CTA appears to contend that it could not have complied with Ibrahim's reading of the settlement agreement without violating the CBA, that is a question of performance of the settlement agreement and does not bring this contract claim under the ILRB's exclusive jurisdiction.

Ibrahim claims that the CTA failed to honor its end of the bargain as agreed to in the settlement agreement, without regard to any obligations it may have pursuant to the CBA. Essentially, Ibrahim is arguing that the settlement agreement "created private contractual rights that existed independent of the rights [Ibrahim] ha[d] under the CBA." *Ferkel v. Bd. of Educ. of City of Chicago*, --- F. Supp. 2d ----, 2014 WL 2209004, at *8 (N.D. Ill. May 28, 2014).[5] This takes his claim outside of the CBA and the ILRB's exclusive jurisdiction. Determining whether the CTA breached the settlement agreement will not "undermine the [IPLRA's] stated purpose and frustrate the legislature's intent to provide a uniform body of law in the field of labor-management relations to be administered by those who have the required expertise in this area." *Cessna*, 693 N.E.2d at 1272. The Court will proceed to consider the merits of Ibrahim's breach of contract claim.

> B.       Merits

The parties have moved for summary judgment on the breach of contract claim, both contending that the agreement unambiguously supports their position. Ibrahim maintains that the settlement agreement required Ibrahim to be placed as a janitor at a single garage and that by failing to ensure that he kept a position at a single fixed location, the CTA breached the agreement. The CTA, on the other hand, contends that the agreement only required it to provide Ibrahim with a full time permanent janitor position, which meant only that he be employed forty hours a week as a janitor, and that the agreement thus was not breached when he was assigned the extra board position based out of the Forest Glen garage. Having reviewed the settlement agreement and the parties' arguments, the Court finds that there is a material issue of fact as to

---

[5] Although *Ferkel* interpreted the Illinois Educational Labor Relations Act, which provides that the Illinois Educational Labor Relations Board has exclusive jurisdiction over claims involving collective bargaining agreements between educational employers and employees, 2014 WL 2209004, at *8, the analysis is equally applicable here.

the agreement's meaning, requiring denial of both parties' summary judgment motions on the breach of contract claim.

In construing a contract, "the primary goal is to give effect to the parties' intent by interpreting the contract as a whole and applying the plain and ordinary meaning to unambiguous terms." *Midway Park Saver v. Sarco Putty Co.*, 976 N.E.2d 1063, 1069, 2012 IL App (1st) 110849, 364 Ill. Dec. 500 (2012). The Court is to construe the contract "as a whole, viewing each provision in light of the other provisions." *Thompson v. Gordon*, 948 N.E.2d 39, 47, 241 Ill. 2d 428, 349 Ill. Dec. 936 (2011). "[I]f the language of a contract is susceptible to more than one meaning, it is ambiguous," and the Court can then consider extrinsic evidence in determining the parties' intent. *Id.* But a contract is not ambiguous "merely because the parties disagree as to its interpretation." *Vill. of Arlington Heights v. Anderson*, 963 N.E.2d 949, 956, 2011 IL App (1st) 110748, 357 Ill. Dec. 551 (2011).

The settlement agreement provides:

> notwithstanding any agreement, contract, document or policy of the CTA to the contrary, including, without limitation [the CBA], CTA agrees to reinstate Ibrahim into (i) that certain full time permanent Buildings and Grounds Janitor position at the bus garage located at the intersection of Kedzie and Madison immediately available and currently held/reserved for Ibrahim or (ii) a full time permanent Buildings and Grounds Janitor position at any other comparable bus garage located within the city limits of Chicago, Illinois immediately available to Ibrahim (either of such positions, hereinafter, the "Job Position").

Ex. H to Joint Stmt. of Undisputed Facts, ¶ 1. Ibrahim argues that by providing for a position at a specific location or at "any other comparable bus garage," the agreement required the CTA to place him at a fixed location, *i.e.*, not in an extra board position in which he could be required to travel from garage to garage weekly or even daily. Ibrahim emphasizes the use of the singular "garage" in the agreement, while the CTA responds by pointing out that, under some definitions,

"any" could mean "all" and thus that the agreement could be read as requiring him to travel to all CTA garages. The proper construction of "any other comparable bus garage" is merely one dispute over the parties' intent.

The CTA contends that, regardless of how that dispute is resolved, the next sentence of paragraph 1 establishes that Ibrahim was subject to job picks:

> The Job Position shall be at the rate of pay of a Buildings and Grounds Janitor, at the same progression level held by Ibrahim on the date he last worked and with no loss of seniority with respect to the benefits of employment with CTA, including but not limited to vacation benefits and not including "picking" rights which are a benefit determined by union seniority, addressed in Paragraph 7, below.

Ex. H to Joint Stmt. of Undisputed Facts, ¶ 1. Paragraph 7 states that "the Union shall determine Ibrahim's union seniority." The CTA contends that the discussion of picking rights as a benefit determined by union seniority means that the agreement did not exempt Ibrahim from picking his job position twice a year, as provided for in the CBA. Ibrahim responds that the fact that he was to be placed in the position "notwithstanding" the CBA overrides this provision and that the reference to picking rights refers only to seniority in picking vacation days.

The settlement agreement also provides that the CTA was to provide Ibrahim with certain equipment, including the 51-pound stationary Optelec magnifier, to be used by Ibrahim on the job. Ibrahim contends that this would not have been included as part of the settlement if he was to travel from one site to another for it would be unreasonable for him to travel with the bulky equipment from garage to garage two or three times a week. Ibrahim further highlights the agreement's provision of an Orientation and Mobility Instructor and Job Coach as evidence that the CTA understood that Ibrahim's visual impairment required familiarity with his surroundings and thus placement at a single location.

15

Both parties also cite to extrinsic evidence to support their positions. Ibrahim relies on his training report, in which Cristofaro wrote that "[f]amiliarization with the environment that [Ibrahim] will be working in and developing and implementing a structured job routine are going to be the ultimate factors in deciding the ability of Mr. Ibrahim to perform his duties." Ex. O to Joint Stmt. of Undisputed Material Facts at 1. This, according to Ibrahim, suggests that a traveling position was not contemplated and that all parties understood that, with his visual impairment, he could not participate in all aspects of the job. The CTA, on the other hand, relies on the CBA to argue that Ibrahim was required to participate in the January 2006 job pick. It also highlights testimony from both CTA and Union officials that the Union would have had to agree to any concessions that would affect the seniority rights, and consequently the job picks, of other janitors. No such agreement was obtained from the Union with respect to Ibrahim; the Union did not sign the settlement agreement and Hill, the Union representative for the Chicago Avenue garage, had not even seen a copy of the settlement agreement until he was deposed for this case. The CTA further contends that Ibrahim was capable of performing all positions as a janitor, including that of an extra board janitor, as long as he became familiar with each location, and that because each garage had a similar layout and could be reached by public transportation, the parties did not intend to exempt Ibrahim from being assigned to an extra board position.

Finally, the CTA argues that Ibrahim has not identified any other employee the CTA excused from job picks. But Ibrahim need not do so in order for his interpretation of the agreement to be adopted. The parties were free to agree that, given Ibrahim's visual impairment, he should remain at one garage so as to have a stable work environment with which he would become familiar instead of moving from garage to garage every week or even several times a week. Alternatively, they could have agreed that he would be subject to job picks. But, as

should be clear from the discussion of the parties' arguments and the agreement itself, the agreement is not well-drafted but instead ambiguous as to the parties' intentions with respect to whether Ibrahim was to be subject to future job picks. But the fact that the CTA has used explicit language in at least one other settlement agreement for a janitor position to make it clear that an individual is subject to a job pick despite initially being placed at a specific garage—regardless of medical limitations—suggests that the CTA could have included such language here if it was the parties' intention to subject Ibrahim to job picks and potential location changes every six months.[6] *See Thompson*, 948 N.E.2d at 47 (court can consider extrinsic evidence where contract language is ambiguous). After specifying the garage the employee was being assigned to, the other settlement agreement went on to state:

> [Employee] acknowledges that, at the first pick of assignments based on seniority as determined by Local 241 after she returns to work, she will resume picking without receiving any favored or increased seniority as a result of this Agreement. [Employee] further acknowledges that as a result of the way the pick is conducted, based on departmental seniority, [Employee] may have to work split days and rotated shifts. [Employee] acknowledges and agrees that CTA has no duty or obligation to alter or adjust the result of these picks due to her medical condition. [Employee] further warrants and represents that she will not try to enforce any duty, obligation or right that would cause CTA to violate or interfere with the results of a pick.

Ex. E to Grp. Ex. R to Joint Stmt. of Undisputed Material Facts, ¶ 11. No such provision was included in Ibrahim's settlement agreement, however.

To summarize, the Court finds that the settlement agreement's language is ambiguous with respect to whether Ibrahim was entitled to a position as a janitor at a fixed location. The parties each set forth reasonable interpretations of the agreement, leaving the Court unable to say

---

[6] Although like Ibrahim's agreement, the other settlement agreements submitted to the Court include clauses stating they are non-precedential and shall not be used in any other legal proceeding, because they were submitted jointly by the parties and the CTA contends that Ibrahim should have identified employees who were treated differently, the Court considers them here.

17

definitively that the parties intended Ibrahim to remain at a fixed location. Indeed, the first two sentences of the first paragraph of the settlement agreement appear contradictory, with the first sentence suggesting that Ibrahim is to be placed in a permanent location and exempt from the CBA's picking requirement and the second sentence suggesting that he nonetheless has to pick his job position twice a year pursuant to the CBA. As the Court cannot resolve this inconsistency and the extrinsic evidence before the Court does not point to only one interpretation, resolution of the ambiguity must be left for the jury. *See Harmon v. Gordon*, 712 F.3d 1044, 1050 (7th Cir. 2013) (interpretation of ambiguous contract is for the jury, unless the extrinsic evidence bearing on the issue is undisputed). Both parties' motions for summary judgment on the breach of contract claim are denied.

### III. Punitive Damages

The CTA contends that Ibrahim's request for punitive damages should be stricken because municipal corporations cannot be held liable for punitive damages. Ibrahim does not respond to this argument, apparently conceding it. The Illinois Tort Immunity Act provides that punitive damages may not be recovered against a local public entity, such as the CTA, in any action brought against it. 745 Ill. Comp. Stat. 10/2-102 ("Notwithstanding any other provision of law, a local public entity is not liable to pay punitive or exemplary damages in any action brought directly or indirectly against it by the injured party."); *Thompson v. Bd. of Educ. of City of Chicago*, No. 11 C 1712, 2013 WL 4080650, at *4 (N.D. Ill. Aug. 13, 2013). Moreover, punitive damages are generally not recoverable in breach of contract actions unless the breach itself is actionable as an independent tort, which is not the case here. *Cruthis v. Firstar Bank, N.A.*, 822 N.E.2d 454, 463, 354 Ill. App. 3d 1122, 290 Ill. Dec. 869 (2004); *see also Morrow v. L.A. Goldschmidt Assocs., Inc.*, 492 N.E.2d 181, 183, 112 Ill. 2d 87, 96 Ill. Dec. 939 (1986)

("The sole purpose of contract damages is to compensate the nonbreaching party, and punitive damages are not available even for a 'wilful' breach of contract."). Thus, the Court strikes Ibrahim's request for punitive damages from the Second Amended Complaint.

## CONCLUSION

For the foregoing reasons, the CTA's motion for summary judgment [122] is granted in part and denied in part. Ibrahim's motion for summary judgment [130] is denied. Summary judgment is granted for the CTA on Ibrahim's ADA failure to accommodate claim. Ibrahim's request for punitive damages is stricken from the Second Amended Complaint.

Dated: February 26, 2015

_____
SARA L. ELLIS
United States District Judge